2018 IL App (2d) 161079
No. 2-16-1079
Opinion filed June 28, 2018

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of McHenry County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 14-CF-645 |
| WILLIAM J. ROSS, | ) ) ) | Honorable Sharon Prather, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Hutchinson and Burke concurred in the judgment.

**OPINION**

¶ 1    Following a jury trial, defendant, William J. Ross, was found guilty of first-degree murder and of having discharged a firearm that caused the death of Jacqueline Schaefer. 720 ILCS 5/9-1(a)(2) (West 2014); 730 ILCS 5/5-8-1(d)(iii) (West 2014). The trial court sentenced defendant to 24 years' imprisonment for first-degree murder and a consecutive 25 years' imprisonment for the use of a firearm, for a total of 49 years' imprisonment (plus 3 years' mandatory supervised release (MSR)). Defendant appeals, arguing that (1) the trial court erred in denying his motion to suppress certain statements to police, where he did not knowingly and intelligently waive his *Miranda* rights; (2) the court erred in admitting evidence of his prior

alleged abuse of Schaefer; (3) the court erred in admitting evidence of defendant's ownership of firearms; and (4) the evidence was insufficient to sustain his convictions. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3     On August 13, 2014, the State charged defendant, then age 63, with one count of first-degree murder (720 ILCS 5/9-1(a)(2) (West 2014)), alleging that, sometime in 2012, he shot Schaefer with a gun, thereby causing her death. Schaefer's body had been found on November 6, 2013, in her bedroom at defendant's residence at 518 North Country Club Drive in McHenry, in a state of advanced decomposition. Renee Bitton, defendant's friend, his former girlfriend, and the property's caretaker (defendant was away on a cross-country trip at this time), discovered the body after she gained access to the room. The door to the room was screwed shut. The screws were covered with caulk and duct tape, which were covered with trim and brown paint. No gun or bullets were recovered at the scene.

¶ 4     In June 2012, defendant had left McHenry and gone on a cross-country road trip, which continued until November 7, 2013, when he was arrested by local police in Las Vegas (on a failure-to-appear warrant for a traffic ticket).

¶ 5   A. Defendant's Motion to Suppress His Statements to McHenry County Sheriff's Detectives

¶ 6     Prior to trial, defendant filed two motions to suppress statements. One motion was directed at a statement he made to Las Vegas Metropolitan Police Department officers after he was arrested in Las Vegas. The trial court denied defendant's motion to suppress the statement, but the State did not seek at trial to introduce any portion of the interview.

¶ 7     In the second motion, which is at issue in this appeal and was filed on August 19, 2015, defendant moved to suppress certain statements he made on November 9, 2013, to McHenry County sheriff's detectives in Las Vegas. (The interrogation was videotaped.) As relevant here,

defendant alleged that his (oral) waiver of his *Miranda* rights was not intelligently and knowingly made, because he did not understand the nature of the rights he was waiving or the consequences of his decision.

¶ 8     The State conceded that defendant was subjected to custodial interrogation.  However, it argued that defendant's educational background (he attended Northwestern University and the University of Illinois at Chicago, and he obtained a master's degree in business administration (MBA) from DePaul University) and work experience (as product and sales manager and sales engineer for a heating, ventilation, and air-conditioning (HVAC) company) showed that he understood his rights and was not coerced.

¶ 9     A videotape and transcript of the interrogation, which was conducted by detectives Thomas Jonites and Ed Maldonado, reflect the following.  At the commencement of the interview, defendant, an alcoholic who was in a wheelchair and whose thumbs were shaking, stated that he was innocent.  Detective Jonites announced that he had to read defendant his rights and asked defendant if he had been read his *Miranda* rights on any prior occasion.[1]  Defendant replied that he "kn[e]w what they are."  Detective Jonites stated that he would read them to defendant, and defendant replied, "They are confusing."  The exchange continued:

> "DETECTIVE JONITES: Okay.  You have the right to talk to a lawyer and have him present with you while you are being questioned.  If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish.  You

---

[1]  The *Miranda* rights are that a suspect "has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."  *Miranda v. Arizona*, 384 U.S. 436, 479 (1966).

can decide at any time to exercise these rights and not answer any questions or make any statements, okay? Do you understand them, Bill?

[DEFENDANT]: No.

DETECTIVE JONITES: What don't you understand about them?

[DEFENDANT]: How much do you have to have to hire a lawyer?

DETECTIVE JONITES: I don't know, Bill. I'm—you know, I'm not an attorney. I'm a police officer. So I don't know what the going rate on an attorney is nowadays.

[DEFENDANT]: And the other one about can and will be held against you.

DETECTIVE JONITES: It says anything you say can and will be used against you in a court of law.

[DEFENDANT]: Well, if you say something that helps you, that could be used to help you in a court of law.

DETECTIVE JONITES: Not in a court of law necessarily but just to help you. Do you understand that?

[DEFENDANT]: Pretty much.

DETECTIVE JONITES: Okay. All right. Could you do me a favor and sign here indicating that I read them to you? And I'm going to write my name right here for you in case you forget. It's Tom Jonites. Right there. Right by the X. You can go ahead and read them again if you would like.

[DEFENDANT]: I said I know.

DETECTIVE JONITES: Oh, I'm sorry. Go ahead—

[DEFENDANT]: I said I don't know.

DETECTIVE JONITES: Okay. Go ahead and sign them.

[DEFENDANT]: No.

DETECTIVE JONITES: You don't?  You wrote no?

[DEFENDANT]: Yeah, because you gave me a right that said that I can and will be held against you.  You didn't say to handle it for you.

DETECTIVE JONITES: And what?

[DEFENDANT]: Can be handled for you by a lawyer of law or—

DETECTIVE JONITES: Yes, I did.  I said right here if you—you have the right to talk to a lawyer and have him present with you while you are being questioned.

[DEFENDANT]: That's not what I'm saying.

DETECTIVE JONITES: And then I said if you could not afford to hire a lawyer, one will be appointed to represent you.

[DEFENDANT]: That's not what I said.

DETECTIVE JONITES: What did you say, Bill?

[DEFENDANT]: You said anything you say can and will be held against you.  I can't agree with that.

DETECTIVE JONITES: It says can and will be used against you in a court of law.  Anything you say that—you know, what—it's just saying that it could be used in a court of law.

[DEFENDANT]: It says it could be used against you, it says.

DETECTIVE JONITES: No, it says it can and will be used against you.  Anything you say can and will be used against you in a court of law.  But like if you give us information about a perpetrator in this, we can use that in a court of law.

[DEFENDANT]: Uh-huh.

DETECTIVE JONITES: And I'm not clear on what you are not understanding, Bill. Do you understand your rights, Bill? I mean—

[DEFENDANT]: No.

DETECTIVE JONITES: Okay. What don't you understand, Bill?

[DEFENDANT]: None of it.

DETECTIVE JONITES: Okay. Is there a certain part you don't have the—

[DEFENDANT]: Well, I'll re-read them again.

DETECTIVE JONITES: Okay. Well, just read them and as you are reading them if there is something you don't understand, Bill, just let me know.

[DEFENDANT]: I understand one.

DETECTIVE JONITES: Okay.

[DEFENDANT]: I don't understand two. You have the right to talk to a lawyer and have him present while you are being questioned.

DETECTIVE JONITES: Uh-huh.

[DEFENDANT]: I understand that. If you do not have a lawyer one will be appointed to be represented. I don't know what that costs. If you decide to—at any time to exercise this right and then not answer questions—

DETECTIVE JONITES: Or make any statements. In other words, you could stop talking to us any time you like.

[DEFENDANT]: I don't understand that.

DETECTIVE JONITES: It's just if you are done talking, you are saying you know what, I'm done talking.

[DEFENDANT]: But if I'm talking in front of a judge—

DETECTIVE JONITES: This ain't in front of a judge. It's do you want to talk to me and my partner Ed here. This is all we are asking.

[DEFENDANT]: What if I say I don't feel like talking?

DETECTIVE JONITES: Then you don't have to talk to us.

[DEFENDANT]: I'll be charged with contempt of court.

DETECTIVE JONITES: I am not charging you with nothing, Bill. It's up to you. You can tell me I don't want to talk to you and—

[DEFENDANT]: I don't like those rights.

DETECTIVE JONITES: But do you understand them and do you want to continue to talk to us?

[DEFENDANT]: I'll talk to you but I cannot understand my rights.

DETECTIVE JONITES: Okay. All right. Well, I read you the rights, Bill, and we went over every aspect of them that I—and tried to explain them to you and everything. With having these rights in mind do you want to talk to me and Ed?

[DEFENDANT]: No.

DETECTIVE JONITES: You don't want to talk to us?

[DEFENDANT]: No, I will.

DETECTIVE JONITES: Okay. All right. Well, good, good.

[DEFENDANT]: But it's not because I understand my rights.

DETECTIVE JONITES: Okay. Well, I don't know how else I could explain them to you any better.

[DEFENDANT]: They wrote them wrong.

DETECTIVE JONITES: Well, they have been like that since the—since I started on the job almost [24] years ago. They have been the same and I've never had anybody that really had a problem understanding them.

[DEFENDANT]: I do.

DETECTIVE JONITES: All right, Bill.

[DEFENDANT]: I'm not trying to be rude.

DETECTIVE JONITES: I know, Bill. I know. And I'm not trying to be rude to you. I'm trying to help you understand.

[DEFENDANT]: I do most of them.

DETECTIVE JONITES: Okay.

[DEFENDANT]: Some of them don't make sense.

DETECTIVE JONITES: Okay. But you understand them even though they don't make sense; right?

[DEFENDANT]: Well, some should be changed.

DETECTIVE JONITES: Okay. All right. I just want to make sure you understand them and that you want to talk to me and Ed.

DETECTIVE MALDONADO: Some of them have to be changed but as of right now you understand them. They just—you understand it—you feel that some of them have to be changed; is that correct?

[DEFENDANT]: Well, I understand what they wrote down what the rights are. You have the right to remain silent. I believe in that.

DETECTIVE JONITES: Okay. Okay. As long as you understand them, Bill, and, I mean, whether you agree with them or not, as long as you understand them and want to talk with Ed and I, you know, we'd like to talk with you, okay? All right."

¶ 10 Thereafter, the interrogation continued. The detectives questioned defendant about Schaefer and his properties, neighbors, and weapons. Defendant related that he had met Schaefer three years earlier when she responded to an advertisement for an upstairs rental unit in his home. While they lived together, defendant and Schaefer dated on and off. After a while, Schaefer began talking about moving to Missouri, where a lot of her things were stored. At one point, after defendant returned from a business trip, Schaefer was gone. He believed that it was October, November, or December of 2011.

¶ 11 Defendant left McHenry in the summer of 2012 for a road trip across the country. Before he left, defendant sealed up his residence, including screwing shut most of the windows and doors. Defendant was concerned that Bitton would break in and take valuable items. Defendant owned another property close by, at 608 Country Club Drive, that he used for investment purposes. Other than Social Security income, he invested in the stock market.

¶ 12 Defendant denied knowing what happened to Schaefer. He stated that she had a lot of enemies. Schaefer's bedroom was across the hall from defendant's bedroom (at some point, she moved out of the upstairs rental unit and into a bedroom on the main level). Before he left McHenry, defendant "might have" sealed the door to Schaefer's bedroom by screwing it shut. He screwed shut all of his doors. Defendant denied that he caulked and painted over the screws on Schaefer's bedroom door.

¶ 13 The detectives asked defendant about his ownership of firearms. Defendant stated that he owned a rifle/shotgun and also had two handguns that he inherited from his father: a .22-caliber

handgun, which he had put in a closet, and a .45-caliber handgun. Two or three "45s" and two other weapons had been stolen from him in the past. One of the 45s was stolen by a "Mr. Ed" while defendant lived in Streamwood. Defendant denied owning a Colt .45-caliber government model 1911 with Pachmayr grips that was listed (with a serial number) on a handwritten note on a yellow sheet of paper found in his house. (The note was admitted at trial and it also referred to two boxes of .45-caliber cartridges and five boxes of shotgun shells.) However, he conceded that he owned an Army-issued "one."

¶ 14 Bitton did various jobs for defendant at his home. Before he left McHenry, Bitton cleaned up glass after the front window of defendant's home broke. Defendant did not know how it broke. Bitton, the detectives reported, claimed that she found a .45-caliber slug in the glass debris by the front door and told defendant about it on the telephone. Defendant told the detectives that Bitton told him that she found the slug in the yard, and he surmised that it was there because children in the neighborhood shoot guns. A couple of months before he left McHenry, defendant told Bitton that he did not want her in his house anymore. He told the detectives that Bitton was a thief and was stealing things from him.

¶ 15 Defendant again denied knowing what happened to Schaefer. Defendant asked the detectives how they knew that Schaefer did not "go floating down the river or something." (Defendant's property abuts the Fox River.) "Maybe she's suicidal."

¶ 16 Eventually, the interrogation became confrontational, with Detective Jonites accusing defendant of killing Schaefer, putting her body into two plastic bags (which he claimed contained defendant's fingerprints), caulking the door to Schaefer's room once the smell became unbearable, and eventually leaving town. He also questioned defendant's story that he sealed the

house to protect his valuables, pointing out that he left a "nice Harley" in the garage, which was not sealed. At this point, defendant requested an attorney and the interrogation concluded.[2]

¶ 17 After a hearing, the trial court denied defendant's motion to suppress, finding that defendant's answers to the detectives' questions "were unreasonable, improbable, argumentative, and a feigned attempt to display a lack of understanding." The court noted that, two days earlier, defendant told Las Vegas officers that he understood his *Miranda* rights[3] and showed his understanding by asserting his right to an attorney at the end of that interrogation. During the interrogation by the McHenry County detectives, defendant did the same thing—he asserted his right to an attorney when the interrogation became confrontational. The court further found that there was no evidence that defendant had limited intellectual capacity or any illness that would affect his ability to understand his rights or intelligently waive them. It noted that defendant had an MBA, was employed throughout his life in "positions requiring a certain amount of intelligence," owned and maintained real estate, and invested in the stock market. Addressing defendant's statement to Las Vegas officers that he was arrested for driving under the influence (DUI) in April 2013 and was hospitalized for 12 days (for a condition caused by his efforts to stop drinking), the court determined that there was no evidence that defendant's condition affected his ability to understand his *Miranda* rights. In summary, the court found that defendant "lacked credibility and engaged in a course of deceptive behavior."

¶ 18 The trial court also addressed defendant's argument that he never acknowledged an understanding of his rights, never agreed to waive them, and never signed a waiver. It rejected

---

[2] Defendant was arrested by McHenry County detectives on July 24, 2014.

[3] Specifically, after a detective read defendant the *Miranda* warnings, he asked, "Do you understand these rights?" Defendant replied, "Yeah," and the interrogation continued.

this argument, finding that there was no evidence that defendant lacked the ability to understand his rights. He did not say that he wanted to remain silent or attempt to terminate the questioning until he had engaged the detectives in conversation for three hours. There also was no evidence, the court noted, that defendant's statements were coerced, that he was threatened, or that he was fearful. Also, he asserted his rights when the interrogation became confrontational.

¶ 19    In summary, the court denied defendant's motion, determining that defendant's statements were made knowingly and intelligently.

¶ 20        B. Defendant's Motion *in Limine* No. 4—Prior Charges of Domestic Violence

¶ 21    On January 14, 2016, defendant filed a motion *in limine*, seeking to bar the State from presenting any evidence about his prior charges of domestic violence. He noted that (1) in 1981, he was charged with battery; (2) in 1994, he was charged with domestic battery, but the charge was nol-prossed; (3) in August 2007, he was charged with domestic battery of Schaefer, but the charge was nol-prossed; (4) in September 2007, he was charged with domestic battery of Schaefer, but, in November 2007, he pleaded guilty to an amended charge of (misdemeanor) battery, a conviction was entered, and he received six months of conditional discharge; and (5) he had not been charged with domestic violence since 2007. Defendant argued that (1) the prior domestic violence charges were not relevant, (2) they were inadmissible because they would be used for their conformity with the present charges, (3) the battery to which he pleaded guilty was not a felony or a crime of moral turpitude and any evidence regarding the crime would be improper, and (4) their probative value was far outweighed by the danger of unfair prejudice and confusion of the issues.

¶ 22    The State moved to admit the prior charges of domestic violence against Schaefer. 725 ILCS 5/115-7.4 (West 2014). It noted that, when officers responded to the August 2007

incident, they observed that Schaefer had bruises on her face and that her lips were bleeding. She also sustained a broken wrist. Defendant was arrested and charged with domestic battery. When officers responded to the September 2007 incident, they observed Schaefer crying, a coffee table was tipped over, and empty beer cans were strewn throughout the room. Defendant claimed that Schaefer had attacked him and punched and choked him. The officers observed no injuries on defendant. Defendant also claimed that Schaefer sustained injuries by falling to the ground. The officers observed textured abrasions and redness on Schaefer's neck, which were consistent with strangulation. Defendant was arrested and charged with domestic battery, and he pleaded guilty to an amended charge of battery.

¶ 23    The State argued that defendant's prior charges of domestic violence against Schaefer were relevant and admissible, where they showed motive and intent to cause injury to her and showed defendant's propensity to commit acts of domestic violence. It also argued that a prior conviction of a crime against the same victim, whether of domestic battery or battery, should be admissible in a subsequent prosecution for first-degree murder. 725 ILCS 5/115-20 (West 2014); *People v. Chapman*, 2012 IL 111896.

¶ 24    On April 5, 2016, the trial court denied defendant's motion *in limine* No. 4 and granted the State's motion *in limine*. In announcing its ruling, the court stated that it had considered the factors in sections 115-7.4 and 115-20 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.4, 115-20 (West 2014)). The trial court noted that the incidents occurred five years before the charged offense but that the remoteness of the incidents alone did not affect their admissibility; rather, it went to the weight to be given to the evidence. The court also noted that it considered the factual similarities between the incidents and the present offense: all involved the same victim, the same location (defendant's home), and alleged violence. It found that the

danger of undue prejudice did not outweigh the evidence's probative value. The court clarified that the evidence was admissible under either statute and even under the common law, as other-crimes evidence.

¶ 25     C. Defendant's Motion *in Limine*—Ownership-of-Firearms Evidence

¶ 26     On July 8, 2016, defendant moved *in limine* to exclude evidence that, during the Las Vegas interrogation, he made various statements to Detectives Jonites and Maldonado concerning his possession of firearms. He noted that no gun or bullets were recovered at or near the room where Schaefer's body was found. He maintained that the evidence of his statements was insufficiently connected to the crime; no eyewitness would testify that defendant killed Schaefer with any particular firearm (or that he was seen with a firearm at or near the time of her death); no expert would testify that Schaefer was killed with a firearm of any particular caliber; defendant did not occupy the house for many months, if not years, after Schaefer died; and the fact that he had once possessed firearms had no probative value. Defendant also asserted that the prejudicial effect of the evidence was "huge" and that the admission of the evidence would violate his second amendment rights.

¶ 27     The trial court denied defendant's motion, finding that defendant's statements were probative circumstantial evidence and that it was for the jury to determine the weight to ascribe to them.

¶ 28                    D. Trial

¶ 29     Trial commenced on July 19, 2016. The State's theory of the case was that, sometime after September 2011, defendant shot Schaefer two times (once in her head and once in her back), killing her, and sealed her body inside his house at 518 North Country Club Drive. As time passed, the body, which was in Schaefer's bedroom in two garbage bags covered with a

tarp, began to decompose. It smelled and attracted insects. Defendant continued to live in the house. Eventually, defendant screwed shut and sealed the windows in Schaefer's room and the rest of the house, along with the doors. In screwing shut the door to Schaefer's room, he also caulked between the door and the doorframe, put duct tape over the caulk, installed trim over the tape, and painted the trim. In July 2012, defendant left to go on a cross-country trip. Defendant, according to the State, had a history of drinking alcohol to excess, renting the upstairs unit to women, dating his renters, and then abusing them. In 2007, two domestic battery incidents involving defendant and Schaefer occurred at the house.

¶ 30    During his case-in-chief, defendant's theory was that he was not present when Schaefer died. He last saw Schaefer in the fall of 2011 and left McHenry on June 15, 2012, to go out west. Defendant also sought to cast doubt on the physical evidence and witness credibility. As to the latter, he focused on Bitton. He had instructed her not to enter his residence. Bitton discovered Schaefer's body on November 6, 2013, and Bitton and Schaefer had a bit of a rivalry over defendant.

¶ 31                                    1. Rose Schaefer

¶ 32    Rose Schaefer, Schaefer's mother, testified that she could not recall the last time she saw Schaefer. In November 2013, a sheriff's deputy took a buccal swab from Rose.

¶ 33                                    2. John Schaefer

¶ 34    John Schaefer, Schaefer's father, testified that he last saw his daughter in 2009 or 2010. He also submitted to a buccal swab.

¶ 35                                    3. Deputy Ryan Hoven

¶ 36 McHenry County sheriff's deputy and certified evidence technician Ryan Hoven testified that, on November 6, 2013, he went to the crime scene after Schaefer's body had been discovered. He photographed the scene, and 249 of his photos were admitted into evidence.

¶ 37 Several photos depicted water damage to the home, including fallen ceiling drywall. Photos of the kitchen depicted cleaning supplies on the counter. In another room, toward the back of the house, there was a dryer, along with a box of supplies that included brown caulk, brown paint, gloves, a screw gun, and drywall screws, which were taken into evidence. A hallway led to a work den or office, two bedrooms, and a bathroom.

¶ 38 Schaefer's body was found in the smaller bedroom, next to the den. The body, which consisted of "mostly bones" and some reddish-blonde hair, was contained within a couple of garbage bags. The room also contained a bed with clothing on it and a dresser. A stack of newspapers next to the dresser included a newspaper dated August 17, 2011. There was also mail that was addressed to Schaefer.

¶ 39 In the larger bedroom across the hall (*i.e.*, defendant's bedroom), there was a bed frame, but no mattress. No mattress was ever located. There were stains on the floor and a garbage bag. Deputy Hoven observed that the window was covered with a board that was screwed into the frame. Thus, the window was screwed shut.

¶ 40 The home had a separate residence on the second floor. It did not appear to be occupied. However, there was food in a refrigerator. These items were not collected, nor were the expiration dates noted. Deputy Hoven did not observe any doors or windows screwed shut upstairs.

¶ 41 The lower level of the house was sealed up. Nearly every door and window was screwed shut from the inside. Specifically, all of the windows, except one, were screwed shut from the

inside. The exception was one window in Schaefer's room, which contained a screw hole but no screw. (That bedroom had three windows total.)

¶ 42 Deputy Hoven identified photographs of the remains of the body, along with the two trash bags. Close-up photos depicted dead insects, some of which the coroner's office collected. Some bones and hair protruded from the bags. The photos also depicted a can of Lysol in the room, along with clothing. The skull had a large hole in it, and there were many bugs inside, including larvae, and around it on the carpet. Deputy Hoven testified that larvae were found throughout the body and on the floor. A receipt on the dresser was dated August 31, 2011. Another photo depicted the screw hole in the window in the room. There was also a seal on the window. The door to Schaefer's bedroom was removed and taken into evidence. The door had been screwed shut, caulked over, duct-taped, and painted.

¶ 43 In defendant's room, there was a roll of duct tape. The windows in the room were boarded up. One photo depicted a handwritten note, listing various items of property. The first item was a .45-caliber handgun with a serial number listed, government model, age three years, and valued at $542. A photo of the outside of the residence depicted a burn pit containing a box spring. In various parts of the home, investigators found caulk guns with brown caulk, a can of brown paint, work gloves, a screw gun, and spray paint. The front door had a board placed over its window with tape around it. The door also had a deadbolt that was screwed to the floor. A door on the south side of the house also had a deadbolt that went into the floor and screws on the doorframe. On the east side, a door that opened to the screened-in patio had black tape along the frame.

¶ 44 Deputy Hoven further testified that the front door was screwed shut from the inside. A glass door was also secured from the inside.

¶ 45                    4. Kelly Krajnik

¶ 46    Kelly Krajnik testified as an expert in forensic science, specializing in biology and DNA analysis. She worked for the Illinois State Police Joliet Forensic Science Laboratory. Krajnik collected DNA from Schaefer's femur and DNA samples from Schaefer's parents. She sent the profiles to the Northeastern Illinois Regional Crime Laboratory for a parentage determination.

¶ 47                    5. Kenneth Pfoser

¶ 48    Kenneth Pfoser, an expert in forensic DNA analysis, testified that, between 2002 and 2015, he worked at the Northeastern Illinois Regional Crime Laboratory as a DNA technical leader. Pfoser received Krajnik's request and conducted a parentage analysis. He opined that there was a 99.9999% probability that the DNA profile obtained from the femur was that of the biological offspring of Rose and John Schaefer.

¶ 49                    6. Deputy Teresa Harper

¶ 50    McHenry County sheriff's deputy Teresa Harper testified that, on November 6, 2013, she was dispatched to 518 North Country Club Drive to investigate a suspicious incident. Bitton had contacted law enforcement and was present when Deputy Harper arrived at about 2:30 p.m., as was Deputy Larson, who advised that there might be human remains inside the residence, in the back room. Deputies Harper and Larson entered the front door of the residence (Bitton remained outside) and observed that the ceiling had collapsed from a water leak. Generally, the residence was in a state of disarray.

¶ 51    In the back room, the deputies lifted the top garbage bag and observed inside it bones, blonde hair, a rib cage, pants, and a spine. They put down the bag, cleared the residence, and went outside to wait for detectives. Deputy Harper testified that Bitton was upset, hysterical, and panicky. Deputy Harper did not observe that the front door had been screwed shut.

¶ 52                     7. Deputy Michael Flannery

¶ 53    McHenry County sheriff's deputy Michael Flannery testified that he prepared a crime scene diagram in this case.

¶ 54                     8. Detective Michael Quick

¶ 55    McHenry County sheriff's detective Michael Quick testified that he collected and documented physical evidence at the scene, including various receipts and a checkbook from Schaefer's bedroom. The date of the last recorded entry in the checkbook was September 28, 2011. He also identified a yearly planner from 2010 or 2011 located in the dining room. A receipt from Ace Hardware in Crystal Lake, dated June 4, 2012, at 12:10 p.m., listed a flashlight, caulk, a battery, "universal espresso brown" (presumably paint), and razor blades. The signature read "William" and then "J" for a middle initial.

¶ 56    Other items that Detective Quick identified included duct tape, a paintbrush, air freshener, garbage bags, rubber gloves, a paint can, drywall screws, and spray paint. There were other home-improvement items in the house and the garage that the evidence team did not collect.

¶ 57    Detective Quick swabbed for potential blood the walls of defendant's room and Schaefer's room, along with the carpet area where Schaefer's remains were found.

¶ 58                     9. Deputy Khalia Satkiewicz

¶ 59    Next, the State offered other-crimes evidence. The jury was instructed that it could consider it only on the issues of intent and motive.

¶ 60    McHenry County sheriff's deputy Khalia Satkiewicz testified that, on August 2, 2007, at about 12:25 a.m., she was dispatched to 518 North Country Club Drive for a domestic battery. When Deputy Satkiewicz arrived, she observed that Schaefer had bruises on her mouth, her lips

were bleeding, and she was holding her right wrist, stating that it was hurting. Deputy Satkiewicz contacted the fire department.

¶ 61 Defendant was also present at the residence. He denied any knowledge of Schaefer's injuries and denied having caused them. Defendant explained that he and Schaefer had just returned from a bar. He also stated that he was "kind of" dating Schaefer and was her landlord. He spent a lot of time in her apartment, and she cooked for him.

¶ 62 Deputy Satkiewicz arrested defendant for domestic battery. While she was transporting him, defendant complained of a headache. A corrections facility nurse examined defendant, and he received no treatment as a result.

¶ 63 At the hospital, Deputy Satkiewicz spoke to Schaefer, who sustained a broken wrist, a bruised arm, and facial injuries. She also took photos of Schaefer's injuries, which were shown to the jury and admitted into evidence.

¶ 64 Deputy Satkiewicz further testified that both defendant and Schaefer had a heavy odor of alcohol on their breath. She did not observe any physical injuries on defendant, but she did not physically examine him. Defendant did not mention that he had any injuries.

¶ 65                          10. Sergeant Andrew Thomas

¶ 66 McHenry County sheriff's sergeant Andrew Thomas testified that, on September 18, 2007, at about 3:09 a.m., he was dispatched to 518 North Country Club Drive for a domestic incident reported to 911. When he arrived at the house, defendant answered the door, asking Sergeant Thomas what he was doing there. Sergeant Thomas responded that there might have been a domestic incident at the residence and that he needed to enter. Defendant responded that Sergeant Thomas had no right to come inside the house. While standing at the front door, Sergeant Thomas observed Schaefer, who was crying in the living room.

¶ 67 Sergeant Thomas entered the home and noticed that the living room was "somewhat of a mess." A coffee table was tipped over and there were beer cans strewn throughout the room, as well as an empty vodka bottle on the floor. Defendant told Sergeant Thomas that Schaefer was his girlfriend, that she had been staying with him for the past week, and that they had been drinking all day and night. Four hours earlier, Schaefer began to " 'freak out.' " She punched defendant in the head with a closed fist, put her arms around his neck to try to strangle him, and, later, yelled and tipped over the coffee table. Sergeant Thomas did not observe injuries on defendant and, when he asked defendant if he was injured or needed medical attention, defendant replied in the negative.

¶ 68 Sergeant Thomas smelled an odor of alcohol on defendant's breath, defendant had reduced motor skills, slurred speech, and red and watery eyes, and he was "clearly intoxicated." Schaefer had a swollen and bloody lip, there were abrasions around her neck, which was red, and she appeared to be slightly intoxicated. Several photographs of defendant's residence and Schaefer were admitted into evidence. Sergeant Thomas asked defendant how Schaefer sustained her injuries, and he replied that she had fallen down. Defendant denied punching, kicking, pushing, or strangling Schaefer. Sergeant Thomas did not find any weapons inside the home. He thoroughly searched the home because Schaefer had complained that there might be weapons in it. He arrested defendant for domestic battery.

¶ 69 Schaefer was taken into custody because there was an outstanding warrant for her for driving while her license was revoked. Emergency personnel examined Schaefer after she complained of right ankle pain, but they did not find a need to administer any medical treatment.

¶ 70                                        11. Ralph Jones

¶ 71    Ralph Jones lived in a house at 517 North Country Club Drive, which is across the street from defendant's residence. He had known defendant for about 25 years and saw him a couple of times per week carrying beer into his home. Jones had never been inside defendant's home and never had a conversation with defendant. Defendant never waved hello when Jones tried to acknowledge him when he saw him outside.

¶ 72    Jones described defendant as very unkempt and unshaven, with unwashed hair and dirty clothes. Jones also had known Schaefer, whom he described as very petite, with long blonde hair.

¶ 73    After a while, Jones stopped seeing defendant (and his vehicle) at the residence. He never saw Schaefer after he stopped seeing defendant. There was "a lengthy period" during which defendant still occupied the house and Schaefer was no longer present. However, her vehicle was still in the driveway for about two weeks, and then it was gone.

¶ 74    Jones further testified that there was a period during which a taxi picked up Schaefer at 7 a.m., but, eventually, it ceased coming to the residence. Thereafter, Jones observed defendant driving Schaefer back and forth to work. Eventually, Jones stopped seeing Schaefer.

¶ 75    Jones described the neighborhood as middle class when he first lived there. Now, property values were increasing. Defendant's property was unkempt, the grass was overgrown, and there was no upkeep on the house.

¶ 76    Jones met Bitton after defendant had left, and they had a conversation concerning leaking pipes at the house. He advised Bitton not to tamper with the house. About one month after the last time that Jones saw defendant, he observed sheriff's officers responding at the house because pipes were leaking. The officers arrived after Jones's conversation with Bitton. Jones did not see an officer enter the residence, nor did he observe Bitton enter the residence. About 45

minutes after the officers arrived, a ComEd truck pulled up at the residence and serviced the residence.

¶ 77                                    12. Deniece Greve

¶ 78    Deniece Greve testified that she worked as a manager at Ace Hardware in McHenry. She identified receipts that reflected defendant's purchases on June 2, 3, 4, 6, and 9, 2012, of screwdrivers, screws, nails, a flashlight, caulk, batteries, razor blades, a scraper, a drill and charger, light bulbs, steel wool, spray paint, air freshener, duct tape, paint, and numerous items from the dollar section. Defendant used a credit card for his purchases.

¶ 79                                    13. Dr. Larry Blum

¶ 80    Dr. Larry Blum testified that he specialized in forensic pathology. He reviewed Dr. Nancy Jones's forensic pathology report and other materials, because Jones was unavailable to testify.

¶ 81    Dr. Blum opined that the cause of Schaefer's death was two gunshot wounds, one entering and passing through her head and one entering and passing through her spine. (Over 60 photographs of the remains and the area where they were located were admitted into evidence and published to the jury.) Dr. Blum explained that Schaefer's remains were found in two black garbage bags that were covered with a tarp. There were several types of insects noted at the scene on or in the vicinity of the remains. He identified several defects in the skull, which were caused, in Blum's opinion, by a gunshot wound, entering the left front lobe and exiting on the right temporal parietal bone. Most of the body was skeletonized, but there was some soft tissue attached that had become adipocere. Dr. Blum noted several fractures that occurred post-mortem, including on the sternum/breastbone and the right ulna. He also identified injuries to the thoracic vertebrae.

¶ 82     Normally, a drug and alcohol screen would be done during an autopsy, but, in this case, there was no blood, so the screening could not be conducted.  Toxicology tests could have been conducted on the hair, but law enforcement and others decided against it.  Dr. Blum could not rule out that Schaefer died as a result of another cause and that the gunshot wounds were made later.  He explained that, if a body were shot shortly after the individual died, the wounds would look essentially the same.  However, to a reasonable degree of medical certainty, he believed that Schaefer suffered her gunshot wounds while still alive.  Dr. Blum could not identify the caliber of the bullet that caused the wound to Schaefer's skull.

¶ 83                    14. Jennifer Monteleone

¶ 84     Jennifer Monteleone testified that she worked at Home Depot as a district asset-protection manager.  She identified receipts for purchases made at the McHenry store on June 2 and 3, 2012.  They contain a credit card number.

¶ 85                    15. Malgorzata Pribek

¶ 86     Malgorzata Pribek testified that she lived at 510 North Country Club Drive, which is next to defendant's residence.  She had seen defendant cutting his grass.  She last saw defendant in May or June 2012.  Before she last saw him, Pribek, who stayed up until 1 or 2 a.m. to wait for her husband to come home from work, noticed that, for four consecutive days, defendant's house lights, both upstairs and downstairs, were on.  Pribek did not see defendant or Schaefer after this. She had last seen Schaefer in January 2011.

¶ 87                    16. Neal Haskell

¶ 88     Neal Haskell, an expert in forensic entomology, testified that he examined four samples of insects taken from the scene, four from the autopsy, photographs of the scene, and certain reports.  The insects included coffin flies and beetles (including larvae and adults) and green

bottle flies. Haskell found peritrophic membrane, which insects produce during digestion. The insects are very specific to dead and decomposing animals or humans. Haskell also checked weather information (for McHenry County, not specifically 518 North Country Club Drive) to assess whether the flies would be active at certain times.

¶ 89    Haskell opined that Schaefer died sometime during the warmer months, between October 2011 and June 2012 (*i.e.*, before defendant left on his trip). He based this opinion on the presence of multiple generations of dermestid beetles (they prefer a body that has become very dry) and the peritrophic membrane, which had dried out. Also, the skeletal remains were very dry.

¶ 90    Haskell had been told that the house was vacated in June 2012 and he later learned that a number of people had entered the house between June 2012 and November 2013. Haskell clarified that his opinion remained the same whether or not people had entered the residence. Haskell further testified that it was *not* likely that Schaefer died between June 15, 2012, and June 30, 2012, though it was possible. It was also possible, but not likely, that Schaefer died in July, August, or September 2012.

¶ 91                                  17. Renee Bitton

¶ 92    Bitton testified that she was taking care of the 518 North Country Club Drive residence but that she lived in Crystal Lake. She met defendant in August 2001.

¶ 93    Defendant lived at 518 North Country Club Drive in 2011. The house had more than one apartment in it. Bitton did not know if someone was renting the upstairs unit in 2011, but Schaefer lived at the residence.

¶ 94    Defendant left the residence on June 15, 2012. Bitton lived in Fox Lake at the time, and defendant came to say goodbye. He drove a blue Jeep Cherokee. He had camping gear with him

and told Bitton that he was going on a road trip. Defendant asked Bitton to cut the grass at his residence and told her to stay out of the house. Bitton did not see defendant again until after November 6, 2013. However, defendant called her daily. When they discussed the house, "[c]onstantly [she] was told [by defendant] not to go inside the house." She obeyed until the pipes burst on January 29, 2013. On that day, Bitton and her friend Jerome Mikos stopped by to check on the house. Bitton observed water pouring down the walls. She was concerned about damage to the inside of the home. She contacted the sheriff's office, and an officer responded. Bitton also contacted defendant and told him what was happening at the residence, and he responded to "[l]eave it alone. Stay out of the house." Nevertheless, Bitton entered the house. Bitton explained that the back door was screwed shut from the outside. She and Mikos unscrewed it and she entered the residence. There was water on the floor. The power was still on, and Bitton turned around and left.

¶ 95 Between January 29, 2013, and November 2013, Bitton (with one or more friends, including, at various times, Mikos, Dawn Jorda, Sherrie Kent, and Stan Parlow) entered the residence about seven times to remove debris, wet furniture, and papers, to remove old food from the refrigerator, and to sanitize the premises. She also removed a stained mattress from defendant's bedroom and burned it. It was 30 years old and had many stains on it; however, she did not notice any reddish-brown stains.

¶ 96 Bitton testified that she last saw Schaefer riding her bike, probably in the summer time. Bitton also said that, when defendant came to say goodbye in June 2012, Bitton had not seen Schaefer for what "could have been" 1½ years (i.e., since about January 2011). She had asked about Schaefer in June, in either 2010 or 2011, and defendant told her that she had moved to Missouri.

¶ 97    On November 6, 2013, the day she discovered Schaefer's remains, Bitton went to the residence with Mikos to retrieve a space heater from the sealed back bedroom (*i.e.*, Schaefer's room).  She had first noticed the sealed room in March 2013 and had asked defendant about it; he replied that he had valuables stored in the room.  However, defendant had a laptop, a guitar, a big-screen television, and other valuables that were *not* sealed in the room.  After Bitton and Mikos unsealed the room, Bitton entered the room.  Bitton saw a tarp and a bag by the door.  She stepped over them and noticed that Schaefer's belongings were still in the room, including clothing, books, and a laptop.  Bitton retrieved the space heater and moved the tarp.  She saw a bag that had small insects around it and opened the bag.  Bitton also saw what looked like a human rib cage.  She was scared and ran out of the house.  Mikos was outside, and she instructed him to call the police.  Mikos first went inside to look at what Bitton had discovered.  Bitton made some calls.  She contacted Michael Oliver, a retired police officer she knew who lived nearby.  Bitton also contacted the sheriff's office.

¶ 98    At one point while visiting the property, Bitton found a bullet between the front door and its storm door.  The top of the bullet was smashed in.  She told defendant about the bullet.  Bitton gave the bullet to her friend Steven Pakulla.  About November 8, 2013, Bitton told police about the bullet, but she denied that she told police that she threw the bullet in a garbage can.  She recalled telling Detective Michelle Asplund that she had kept the bullet, showed it to friends, and then lost it.  However, she testified that she also told Detective Asplund, after the detective confronted her with her statement that she had thrown the bullet away, that she had forgotten that she had *not* thrown it away.  "It slipped my mind."  "It was gone.  I didn't really know if I had lost it or thrown it away.  I lose things."   She continued, "No, I did not throw it away, but I misplaced it or—."

¶ 99    Initially, Bitton did not tell police about the mattress, because it did not come up.  Then she stated that she did tell police that she had taken the mattress out of the residence and burned it.  There was no particular problem with insects in defendant's bedroom as opposed to the rest of the house.  "The whole house was pretty filthy" for a long time and was abandoned.

¶ 100                              18. Jerome Mikos

¶ 101    Mikos testified that, in 2012, he dated Bitton.  He knew defendant through Bitton.  Bitton spoke to defendant and worked for him after he left, including cutting the grass.

¶ 102    In the summer of 2012, Bitton ran errands for defendant, including buying cleaning supplies, black plastic bags, etc.  Mikos testified that he did not enter defendant's house, because defendant did not want anyone in the house.  When Mikos came to the property, defendant would come out to the garage so Mikos could not go any farther.  The garage was about 100 feet from (and in front of) the house.  In the summer of 2012, the weather was warm but defendant wore a heavy sweater and soiled jeans and had a beard and long hair.

¶ 103    After defendant left to go on his trip, Bitton spoke to him daily and ran errands for him.  Defendant paid her.  Bitton and Mikos were instructed not to enter the residence.  Defendant gave these instructions often on the phone (which Mikos overheard because Bitton had it on speaker mode).  Mikos sometimes accompanied Bitton when she took care of defendant's residence.  Bitton did not have a key to the property.  Defendant stated that he would return soon but did not say when.

¶ 104    In January 2013, Mikos discovered that the pipes were leaking in the residence.  Through a window, he observed water coming down the walls.  Bitton contacted the police, who could not do anything about the issue.  Defendant, whom Bitton had contacted, suggested cutting the wires on the well pump "so [they] didn't have to go inside."  Mikos was uncomfortable with this plan

because he did not want to cut a live power line. Defendant did not tell them that they could go into the house. Eventually, Mikos called ComEd to pull the meters, which stopped the well pump. Mikos and Bitton entered the home through the back door, from which they had to remove screws because the door was screwed shut from the inside and outside. They also had to kick it open. Mikos was in the home for about one hour. He went inside to check everything out, since he knew that the power was off. It was a mess. Ceiling material was on the carpet and the television. Mikos did not notice the sealed bedroom.

¶ 105   On November 6, 2013, Mikos accompanied Bitton to the residence to help her clean up. Mikos was doing gutter work on defendant's other property nearby. Bitton was mad at defendant about something and wanted to enter the sealed bedroom; she also wanted the space heater that was in that room. Mikos helped Bitton unseal the door, using a box-cutter knife and a flat bar. "It wasn't too hard" to open the door. He saw a blue tarp and then went outside to work on the gutter project. Bitton then came running out of the house, crying. Mikos went inside to see what Bitton discovered. He opened a black bag and saw ribs and a leg. Mikos went outside, and they contacted the police.

¶ 106   Mikos further testified that he could not recall whether the front door was screwed shut when he and Bitton discovered the body, but the side door was screwed shut. He and Bitton did not screw shut the back door after opening it in January 2013.

¶ 107                                   19. Mary Beth Thomas

¶ 108   Mary Beth Thomas, a forensic scientist with the Illinois State Police Rockford Forensic Science Laboratory with expertise in latent print examinations, testified that she checked for fingerprints on items taken from defendant's residence. The items included duct tape (with potential pieces of latex), a door, and door trim. Thomas did not find any fingerprints. She

forwarded the duct tape to the biology section for DNA testing. The chemistry section analyzed other items, including conducting a caulk comparison. The door and the trim were not sent for testing. Thomas did not swab the door or the trim for DNA.

¶ 109                           20. Blake Aper

¶ 110   Blake Aper, a forensic scientist in the biology and DNA section of the Illinois State Police Rockford Forensic Science Laboratory, testified as an expert in forensic DNA analysis. He compared a DNA profile from defendant with one from a piece of latex glove found on duct tape located in the bathroom adjacent to the bedroom where Schaefer's remains were found. Aper opined that defendant *could not be excluded* as having contributed to the DNA profile found on the latex glove. Aper also compared defendant's DNA profile to a profile from duct tape removed from the door frame (which also had a piece of latex stuck to it). He opined that defendant's DNA profile *matched* the DNA profile from the piece of latex.

¶ 111   Aper did not swab for DNA either the piece of duct tape or the underside of the pieces of latex. He did not want to pull the latex off the tape, because he was concerned about destroying the evidence by tearing it to pieces. Also, the inner portion of the glove is where the wearer has contact with it. Aper also did not test any hair, including a strand found in the caulk.

¶ 112   Aper further testified that he received swabs from a bedroom wall. No blood was indicated on those swabs. He also received a buccal standard from Bitton, but it was not compared to other evidence obtained in the case.

¶ 113                        21. Deputy Charles Hoffman

¶ 114   McHenry County sheriff's deputy Charles Hoffman testified that, on January 29, 2013, he responded to a call reporting a water leak at defendant's residence but did not attempt to enter the house. An attempt to contact defendant was not successful. Deputy Hoffman spoke to Bitton

and Mikos. He told Bitton not to enter the home without defendant's permission. Deputy Hoffman walked around the house to look in the windows.

¶ 115                                    22. Detective Ed Maldonado

¶ 116   Detective Maldonado testified that he subpoenaed defendant's financial records. He also reviewed eight transactions from Ace Hardware and Home Depot dated June 2 through 6 and June 9, 2012. Detective Maldonado spoke to Greve at Ace Hardware and Adam Kasprzka at Home Depot. He also reviewed Schaefer's checkbook and found various debit and benefit cards in her name. Detective Maldonado reviewed a day planner that he believed belonged to Schaefer. It contained her name, her address, and a piece of mail addressed to her. Its last entry was dated September 29, 2011.

¶ 117   On November 9, 2013, Detectives Maldonado and Jonites traveled to Las Vegas and met with defendant at the Clark County jail. Detective Jonites asked most of the questions, and the interview was audiotaped and videotaped. The videotape was played for the jury.

¶ 118   Detective Maldonado knew that defendant was a severe alcoholic. In the videotape, defendant is seen in a wheelchair. Detective Maldonado also knew that defendant was well educated and had been gainfully employed, selling HVAC equipment.

¶ 119   On the videotape, after a discussion about *Miranda* rights, defendant agreed to speak to the detectives. Detective Maldonado testified that, during the interview, the detectives told several lies, including that fingerprints were found on the garbage bags. Even though the detectives exaggerated the strength of the evidence against him, defendant never confessed.

¶ 120   The State rested. Defendant moved for a directed verdict, and the trial court denied his motion.

¶ 121                                    23. Michael Oliver

¶ 122   Oliver testified that he had known defendant for about 25 years.  Oliver owned property at 516 North Country Club Drive, adjacent to defendant's home.  Oliver testified that, over the years, defendant's appearance changed.  In recent years, defendant was not taking care of himself, including with his personal hygiene.

¶ 123   Beginning in the early summer of 2012, Oliver noticed that defendant was gone.  By January 2013, defendant's property appeared to be abandoned.  Also that month, water pipes burst at the residence and the ceiling collapsed.  Between when the pipes burst and Schaefer's body was discovered, Oliver entered the residence on two occasions, in the summer and the fall of 2013.  The first time he entered, the outside lights were on, doors were open, the screen door was in the open position, and the interior doors were open.  Inside, Oliver observed that the ceiling had collapsed onto the main floor and the house was in disarray.  There was mold on the walls.  Oliver walked into one bedroom and observed clothes thrown everywhere and a mattress on the floor.  He did not see a door sealed with caulk.  The second time he entered, the interior looked very much the same, but the plants growing in the carpeting had gotten larger.  He did not notice a room that was sealed or caulked.

¶ 124   Oliver explained that he entered the house because he felt that something was wrong, with no one around but the lights on and the doors open.  However, he did not contact the sheriff's department.  He knew that Bitton was taking care of the home.

¶ 125                             24. Sherrie Kent

¶ 126   Kent testified that, in the summer or fall of 2013, she entered defendant's residence with Bitton and Jorda.  Bitton had told her "about the door that was boarded up and said it was weird."  Kent saw the sealed door, but she also observed a mattress in the adjoining bedroom (*i.e.*, defendant's bedroom).  The bedroom was cluttered and everything was a mess.  The

mattress was "way low," but she could not recall if it was on a bed frame. The mattress had a large, dark brown stain, about 18 inches in diameter.

¶ 127                                     25. Stipulation Concerning Jorda

¶ 128   The parties stipulated that, on August 21, 2015, a private investigator interviewed Jorda. If called to testify at trial, Jorda would testify that she had known defendant for a long time and that she had met Schaefer only once, at defendant's house and in Bitton's presence. Bitton was showing Jorda a new sewing machine. Schaefer jumped to the conclusion that Bitton was selling or giving Jorda the machine, and it had to be explained to Schaefer that she was not.

¶ 129   Jorda had been in defendant's home numerous times before he left in June 2012. After he left, some time passed before Jorda went inside the house, because Bitton told her that defendant did not want anyone in the house.

¶ 130   Bitton would call Jorda for help in maintaining the house. Eventually, the restriction about being in the house was eased, and Jorda and others were permitted inside. However, Bitton told her that defendant stated that he wanted everyone only in the kitchen or living room.

¶ 131   Jorda could not provide the investigator with a reasonably accurate estimate of the number of times she was in the house before Schaefer's body was discovered. When asked if it was 25 times, she answered that it was probably more.

¶ 132   Jorda observed the door sealed with brown caulk and commented "what the" to Bitton, who had no explanation.

¶ 133                                     26. Defendant

¶ 134   Defendant, then age 64, testified that he retired in 2013. He denied killing Schaefer, did not know who killed her, and was not present when she died.

¶ 135   Defendant met Schaefer in 2007 after he placed an advertisement in the newspaper for the rental apartment above his residence.   Schaefer became his renter and, eventually, they started dating (for a few years).

¶ 136   Defendant last saw Schaefer in the fall of 2011.   She was living with defendant at his residence and had her own room.   They were no longer dating.   In the fall of 2011, defendant was visiting a friend in Wisconsin, and, when he returned, she was gone.   He did not see Schaefer leave. He assumed that she moved to Missouri, because she had mentioned doing so numerous times.

¶ 137   Between the fall of 2011 and June 15, 2012, defendant lived at the residence and drank on a regular basis.   He purchased home supplies for years, including from Home Depot, Menard's, Ace Hardware, and other places.   He purchased caulk, tools, sandpaper, paint, drill bits, nails, etc.  Defendant decided to leave Illinois on June 15, 2012, because he was retired and wanted to visit his sister and friends around the country.   On his trip, he paid for purchases with cash or a credit card.   After he left, he kept in contact with Bitton, whom he had met in 2001 and had dated for a couple of years.   Bitton knew Schaeffer.

¶ 138   When he left Illinois, defendant had arranged for Bitton to maintain the outside of his residence and mow the lawn.   He paid her.   Defendant denied that, before he left, he sealed Schaefer's bedroom.   However, he did lock up the house and secure most of the doors and windows by screwing them shut.   He had important items all over his house and did not want anyone, including Bitton, to steal them.   The cabinets in his office were locked when he left. Defendant never gave anyone permission to open the cabinets.

¶ 139   Defendant did not know how his DNA got on Schaefer's door.   He had enemies, and someone might have planted it there.   Bitton and possibly her friend might have done it.   Bitton

was often not very friendly. Defendant believed that his enemies conspired to frame him for homicide.

¶ 140 Defendant did not know why Schaefer left her identification (Missouri), credit cards, and checkbook in his house if she moved to Missouri. Schaefer had enemies, including a man, Mark Brier, she used to live with in Missouri whom she had gotten arrested. Also, she hung out with a motorcycle gang in Missouri and told defendant that they were all involved in drugs and that there was a problem with a "meth" lab there. Also, Schaefer had issues with her parents and, although defendant did not believe the story, she told him that people in her family wanted her dead because they had an insurance policy on her. Defendant told Detectives Jonites and Maldonado that he had heard (from Bitton and others) that Schaefer was a drug dealer. However, she never did drugs around defendant.

¶ 141 Addressing the two prior domestic violence charges involving Schaefer, defendant denied that he beat up Schaefer or broke her wrist. He thought that she fell down or that someone else injured her. Regarding the September 2007 incident, defendant left the bar ahead of Schaefer, went home, and went to bed. At one point, the police knocked on the door and stated that Schaefer complained that defendant had pushed her. He was arrested.

¶ 142 Defendant told Detectives Jonites and Maldonado that Schaefer had talked about suicide, but he did not think she committed suicide. "She talked about a lot of crazy things beside that so—."

¶ 143 Defendant sealed the windows because Bitton would open windows in the winter after defendant had weather-sealed them. He also did not want anyone to steal his valuables, which included stereo equipment, televisions, guitars, clothes, financial documents, computers, fax

machines, books, and memorabilia. He was concerned about Bitton's friends, whom he did not want around.

¶ 144   Defendant spoke to Bitton about every other day while he was on his trip. He instructed Bitton not to enter the house, because he did not want her to take or destroy anything or have her friends over for parties or to engage in illegal activities. Defendant explained that, when the pipes burst, he told Bitton to cut the power so the water pump would stop.

¶ 145   Addressing his ownership of firearms, defendant testified that "Mr. Ed" took his .45-caliber weapon "a long time ago" when defendant lived in Streamwood. Five guns had been stolen from defendant. Two were during residential burglaries, where more items were stolen. The .45-caliber weapon with Pachmayr grips listed on the yellow piece of paper was presumably lost. Defendant was going to report it to the police, but they told him that he had to come into the station and, after discussing it with Bitton, he decided that it was not worth it. Defendant had contacted police in Fox Lake about another missing firearm, and they told him that a missing firearm is generally almost impossible to locate.

¶ 146   Defendant had told detectives that Bitton informed him that she had found Schaefer with a needle in her arm and that she had died of an overdose. Bitton was a friend, but she was also a thief and a liar. When she told him about Schaefer, she was probably withdrawing from cocaine which she regularly used. "It's not a secret." Nevertheless, defendant agreed to let her take care of the outside of his property, because it was less expensive than paying a landscaping company. He trusted her to a point, but he took his chances.

¶ 147                    E. Verdict and Subsequent Proceedings

¶ 148   The jury found defendant guilty of first-degree murder. On July 27, 2016, defendant moved for a new trial, and the trial court denied the motion. On November 9, 2016, the trial

court sentenced defendant to 24 years' imprisonment on the first-degree murder conviction and 25 years for the mandatory firearm enhancement, for a total of 49 years (plus three years' MSR). In announcing its sentence, the court noted that the evidence against defendant was "completely overwhelming." The court denied defendant's motion to reconsider the sentence. Defendant appeals.

¶ 149                                    II. ANALYSIS

¶ 150                    A. Motion to Suppress —Validity of *Miranda* Waiver

¶ 151   Defendant argues first that the trial court erred in admitting his statements to Detectives Jonites and Maldonado in Las Vegas, because defendant did not knowingly and intelligently waive his *Miranda* rights. He contends that he told the detectives that he did not understand the *Miranda* warnings and yet they continued the interrogation without ever establishing otherwise. For the following reasons, we reject defendant's argument.

¶ 152   A reviewing court applies a two-part standard of review to assess a trial court's ruling on a motion to suppress evidence. *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006). Findings of fact and credibility determinations made by the trial court are accorded great deference and will be reversed only if they are against the manifest weight of the evidence. *People v. Slater*, 228 Ill. 2d 137, 149 (2008). The trial court is in a superior position to determine and weigh the witnesses' credibility, observe their demeanor, and resolve conflicts in their testimony. *Id.* at 151. A finding is against the manifest weight of the evidence where the ruling is unreasonable. *People v. Shelby*, 221 Ill. App. 3d 1028, 1039 (1991). However, we review *de novo* the trial court's ultimate legal ruling on a motion to suppress. *Luedemann*, 222 Ill. 2d at 542.

¶ 153   Under *Miranda*, a defendant's custodial statements are inadmissible unless the statements were preceded by (1) the defendant's voluntary, knowing, and intelligent waiver of his or her

right not to be compelled to testify against, or incriminate, himself or herself and (2) the defendant's waiver of the right to have an attorney present during the interrogation. *Miranda*, 384 U.S. at 444. There is a distinction between a voluntary confession and a knowing and intelligent waiver of *Miranda* rights. *People v. Bernasco*, 138 Ill. 2d 349, 358 (1990). A defendant validly waives *Miranda* rights when he or she (1) freely and deliberately (voluntarily) relinquishes the rights, rather than through intimidation, coercion, or deception and (2) is fully aware of both the nature of the rights he or she is abandoning and the consequences of his or her decision to do so. *Moran v. Burbine*, 475 U.S. 412, 421 (1986); see also *People v. Braggs*, 209 Ill. 2d 492, 514-15 (2003).

> "If intelligent knowledge in the *Miranda* context means anything, it means the ability to understand the very words used in the warnings. It need not mean the ability to understand far-reaching legal and strategic effects of waiving one's rights, or to appreciate how widely or deeply an interrogation may probe, or to withstand the influence of stress or fancy; but to waive rights intelligently and knowingly, one must at least understand basically what those rights encompass and minimally what their waiver will entail." *Bernasco*, 138 Ill. 2d at 363.

In determining whether a waiver was knowing and intelligent, a court must look at the specific facts and circumstances, including the defendant's background, experience, and conduct. *Braggs*, 209 Ill. 2d at 515.

¶ 154 Here, it is undisputed that defendant had been arrested and was in police custody when he spoke to the detectives. See *Miranda*, 384 U.S. at 444 (before *Miranda* warnings are required, an individual must first be under "custodial interrogation," meaning "questioning initiated by law

enforcement officers after a person had been taken into custody or otherwise deprived of his freedom of action in any significant way").

¶ 155   Defendant argues that the interrogation transcript reveals that he did not understand the rights as they were read to him.  When asked by Detective Jonites if he understood his rights, defendant responded, "no."  Defendant further notes that he continued to ask questions, including about the cost of an attorney and whether he could help himself by saying something.  He refused to sign the waiver, explaining again that he did not understand his rights.  Defendant also notes that, when the detective asked defendant what he did not understand, defendant replied, "none of it."  The back and forth continued, with defendant stating that the rights did not make sense, that he believed he might be held in contempt of court, etc.  He also contends that, regardless of his education and employment background, at the time of the interrogation he was confused.  He was no longer employed and he had earned his degrees years earlier.  Defendant notes that (as the trial court found) he had recently been arrested for DUI (in April 2013) and hospitalized for 12 days.  At the time of the interrogation, he was an alcoholic likely suffering from withdrawal.  He asserts that his physical condition was far more relevant to his ability to understand *Miranda* than his educational background ("dozens of years earlier").

¶ 156   The trial court found that defendant impliedly waived his rights and further found his responses argumentative and displaying a feigned lack of understanding.  The court noted defendant's educational and employment background, which evinced a certain amount of intelligence, and it found that defendant's request for an attorney during the interrogation reflected that he understood his rights.

¶ 157   The State likewise asserts that the record reflects that defendant understood his rights and was unreasonable and argumentative during the interrogation.  It points to defendant's education,

employment background, real estate ownership, investments, and prior contacts with police as reflecting that he could understand his rights. It further notes that, during his interview with Las Vegas police, a transcript of which is contained in the record, defendant stated that he understood his rights. Specifically, after a detective read defendant the *Miranda* warnings, the detective asked, "Do you understand these rights?" Defendant replied, "Yeah," and the interrogation continued. Also, the State notes, during the interview with Detectives Jonites and Maldonado, defendant invoked his right to remain silent when he was confronted with evidence that pointed to him as the killer. As to defendant's point that he was hospitalized for 12 days when he tried to stop drinking, the State contends that there was no evidence that this impaired his intellect.

¶ 158 Defendant relies on *People v. Redmon*, 127 Ill. App. 3d 342, 349 (1984), where the reviewing court held that the trial court erred in refusing to suppress the defendant's oral confessions. The defendant, age 17, was interrogated four times over 19 hours, but a court reporter was present for only the final interrogation. During the first three interviews, the defendant agreed that he understood his rights. However, during the final interrogation, the defendant stated that he did not understand his rights, specifically his right to an attorney. When the assistant State's Attorney reminded him that he had agreed earlier in the day that he understood his rights, the defendant replied that he did not, because "[he] never been too much arrested and really understand." *Id.* at 345-46. The interview ended when the defendant stated that he did not want to continue the interview. At the hearing on the defendant's motion to suppress, the defendant presented expert testimony concerning his mental ability. The expert testified that the defendant's IQ fell within the category of borderline mental deficiency, ranging from 70 to 73 and with about a fourth or fifth grade reading level. The defendant, the expert opined, would not understand his rights if they were merely recited in rote fashion, and he

required "considerable detail with caution as to" their meaning. *Id.* at 346. The reviewing court held that the motion to suppress should have been, allowed because the defendant's youth, limited mental ability, and confusion concerning his rights showed that he did not make a knowing, intelligent, and voluntary waiver of his rights. *Id.* at 349. He did not possess the requisite intellectual or verbal skills to comprehend a rote reading of his rights, and none of the officers attempted to explain them. *Id.*

¶ 159 *Redmon* is clearly distinguishable. Here, defendant did not present any expert testimony concerning his intellectual ability and there is no evidence in the record that his intellect was impaired by his alcoholism or otherwise. His educational background, which includes an MBA, and his work experience in sales reasonably reflect, as the trial court noted, "a certain amount of intelligence." Reviewing the interrogation videotape and transcript, we cannot reasonably infer that defendant did not understand his rights. Initially during the interrogation, defendant stated that he knew what the *Miranda* rights were but that they were confusing. After they were read to him, he asked about the cost of hiring an attorney. As the interrogation continued, defendant disagreed with the warning that any statement he makes can and will be held against him. Defendant then changed course and stated that he understood "[n]one of it." He reread the warnings and stated that he understood the first one, did not understand the second, understood his right to an attorney but did not know the cost, and did not understand that he could stop talking at any time without being found in contempt of court. The detectives explained that he had not been charged with any crime at that point. However, defendant alternated between stating that he did not "like those rights" and did not understand them. He agreed to speak to the detectives, but claimed, as to the warnings, that "[t]hey wrote them wrong" and that "some of them don't make sense" and "should be changed." Finally, defendant stated, "I understand what

they wrote down what the rights are. You have the right to remain silent. I believe in that." At that point, the interrogation continued with questions about the murder. The foregoing reflects that defendant might have disagreed with some of the warnings, but it is telling that, once the interview became confrontational, he invoked one of his rights and requested an attorney. (As the State notes, he had no problem telling Las Vegas police that he understood his rights.) Further, the inconsistency and shifting focus of his answers reasonably reflect (*i.e.*, show that it was not against the manifest weight of the evidence to find) a feigned misunderstanding of his rights.

¶ 160   In summary, the trial court did not err in admitting defendant's statements to Detectives Jonites and Maldonado.

¶ 161                           B. Admission of Other-Crimes Evidence

¶ 162   Next, defendant argues that the trial court erred in admitting evidence of his prior, *i.e.*, 2007, alleged abuse of Schaefer. We disagree.

¶ 163   A trial court's decision to admit other-crimes evidence will not be reversed on appeal, unless the court abused its discretion. *People v. Donoho*, 204 Ill. 2d 159, 182 (2003). A trial court abuses its discretion if its determination is unreasonable. *Id.*

¶ 164   Generally, evidence of other crimes is not admissible for the purpose of showing the defendant's character or propensity to commit crime. Ill. R. Evid. 404 (eff. Jan.1, 2011); *People v. Illgen*, 145 Ill. 2d 353, 364 (1991). Evidence of other crimes is admissible, however, where it is relevant to prove *modus operandi*, intent, identity, motive, or absence of mistake, or for any purpose other than to show character or propensity. Ill. R. Evid. 404(b) (eff. Jan.1, 2011); *Illgen*, 145 Ill. 2d at 364-65. Also, notwithstanding the general prohibition on other-crimes evidence being admitted to show the defendant's character or propensity to commit crime, such evidence

is admissible to prove character or propensity as provided in sections 115-7.3, 115-7.4, and 115-20 of the Code. 725 ILCS 5/115-7.3, 115-7.4, 115-20 (West 2016); see also Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). Even if other-crimes evidence is admissible, however, it may be excluded if the evidence is irrelevant, or if the risk of undue prejudice substantially outweighs its probative value. Ill. R. Evid. 403 (eff. Jan. 1, 2011); *People v. Dabbs*, 239 Ill. 2d 277, 289-90 (2010).

¶ 165 "Evidence of other crimes [or bad acts] is objectionable not because it has little probative value, but rather because it has too much." *People v. Manning*, 182 Ill. 2d 193, 213 (1998). The danger is that the fact finder will "convict the defendant only because it feels that defendant is a bad person who deserves punishment." *Id.* at 213-14. "[T]he law distrusts the inference that, because a person committed other crimes or bad conduct, he [or she] is more likely to have committed the crime charged." *People v. Brown*, 319 Ill. App. 3d 89, 99 (2001). Thus, where the other-crimes evidence "has no value beyond that inference, it is excluded." (Internal quotation marks omitted.) *Manning*, 182 Ill. 2d at 214. Even other-crimes evidence that is relevant for a proper purpose will be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *People v. Pikes*, 2013 IL 115171, ¶ 11; see also Ill. R. Evid. 405 (eff. Jan. 1, 2011).

¶ 166 Here, the trial court allowed the evidence of other criminal charges brought against defendant: the August 2007 domestic battery charge that was nol-prossed and the September 2007 domestic battery charge on which he was convicted of battery. The court allowed the evidence pursuant to sections 115-7.4 and 115-20 of the Code and under the common law.

¶ 167 Defendant argues that sections 115-7.4 and 115-20 of the Code require that the evidence that the State seeks to introduce be relevant and that its probative value be weighed against the prejudice to the defendant. Both statutes further provide that, in weighing probative value

against prejudice, the court may consider: (1) the proximity in time to the charged offense; (2) the degree of factual similarity to the charged offense; or (3) other relevant facts and circumstances. 725 ILCS 5/115-7.4(b), 115-20(c) (West 2016). Defendant maintains that consideration of these factors demands the conclusion that the evidence should not have been admitted.

¶ 168 Specifically, defendant first notes that, on August 2, 2007, both defendant and Schaefer had been drinking and, when police responded to the home, Schaefer had visible signs of injury. No witnesses provided any information as to what, if anything, transpired between defendant and Schaefer, and, defendant notes, he denied harming Schaefer or knowing how she had been injured. That charge was later dismissed. Next, on September 18, 2007, both defendant and Schaefer had been drinking and, when police arrived, Schaefer had visible signs of injury. Defendant argues that Schaefer's claims that there were weapons in the home were not true, and defendant denied at the time that he had harmed Schaefer. He was arrested and charged with domestic battery, but he subsequently pleaded guilty to the lesser charge of battery.

¶ 169 In this case, the trial court denied defendant's motion *in limine* No. 4 and granted the State's motion *in limine*. In announcing its ruling, the court noted that it had considered the factors in sections 115-7.4 and 115-20. The court noted that the incidents occurred five years before the charged offense but that the remoteness of the incidents alone did not affect their admissibility; rather, it went to the weight to be given to the evidence. It specifically noted that case law had upheld the admission of evidence of an offense that occurred 12 to 15 years prior to the charged offense. The court also noted that it considered the factual similarities between the incidents and the present offense: the same victim, the same location (defendant's home), and alleged violence. It found that the danger of undue prejudice did not outweigh the evidence's

probative value. The court clarified that the evidence was admissible under either statute, as well as under the common law. We further note that the jury was instructed that it could consider the evidence only on the issues of intent and motive.

¶ 170   Defendant contends that the undue prejudice far outweighed the evidence's probative value. He maintains that there was little probative value to the prior incidents. Alcohol appeared to be the catalyst for what allegedly occurred. One could infer from the evidence that defendant and Schaefer drank to excess on two occasions and that the police were called. Defendant urges that, in contrast, the State did not produce any evidence that alcohol played a role in the events leading to Schaefer's death. Also, defendant argues that there was no evidence that he inflicted Schaefer's injuries in 2007, nor was there evidence that he used a gun in the incidents. As to the latter point, defendant notes that no guns were located in the home at the time. Defendant and Schaefer continued to associate for years after the incidents, which suggests, in defendant's view, that Schaefer did not interpret the incidents as indicating that defendant would harm her in the future. Finally, only one misdemeanor battery conviction resulted from the incidents, suggesting to defendant that his guilt was not as clear-cut as the jury was led to believe.

¶ 171   He also maintains that the prejudicial nature of the evidence was overwhelming. The jury viewed photos of Schaefer's injuries and heard testimony from police officers that defendant had repeatedly physically abused her. The danger, defendant urges, was that the jury would believe that, simply because Schaefer was previously injured at or around a time that she was in defendant's company, defendant must have injured her. That conclusion, further, would cause the jury to believe that defendant was a bad person who needed to be punished. Thus, he would be convicted not on evidence that he later caused her death, but because, in 2007, the parties engaged in drunken squabbles. Defendant also argues that the evidence overall was close and,

thus, the unfair prejudice to him of the other-crimes evidence was magnified and far more likely changed the outcome of the trial.

¶ 172   The State responds that there was more than mere general similarity between the previous offenses and the charged crime and that the trial court correctly found that the offenses were similar.   As to defendant's argument that the previous incidents were alcohol-related but there was no evidence of alcohol use in the present case, the State contends that this issue had little bearing on the matter.   Rather, defendant's use of violence against Schaefer was the focus. Finally, the State argues that, even if the admission of the evidence was erroneous, any error was harmless.

¶ 173   We conclude that the trial court did not err in admitting the other-crimes evidence.    The record supports the court's determination.  First, as the trial court noted, the fact that nearly five years had elapsed between the 2007 events and Schaefer's death in 2011 or 2012 did not, in itself, affect the admissibility of the evidence.  See, *e.g.*, *Donoho*, 204 Ill. 2d at 184-85 ("while the passage of 12 to 15 years since the prior offense may lessen its probative value, standing alone it is insufficient to compel a finding that the trial court abused its discretion by admitting evidence about it" under section 115-7.3 of the Code[4]); *People v. Braddy*, 2015 IL App (5th) 130354, ¶ 37 (20-year time lapse; affirming admission under section 115-7.3); *People v. Davis*, 260 Ill. App. 3d 176, 192 (1994) (same; affirming admission under the common law); see also

---

[4] Sections 115-7.3 and 115-7.4 of the Code are nearly identical, with section 115-7.3 addressing prior incidents of sexual abuse, and section 115-7.4 addressing prior incidents of domestic violence.  725 ILCS 5/115-7.3(a), 115-7.4(a) (West 2016).  Both statutes require the trial court to weigh the probative value of the evidence against undue prejudice to the defendant. 725 ILCS 5/115-7.3(c), 115-7.4(c) (West 2016).

*People v. Nixon*, 2016 IL App (2d) 130514, ¶ 42 (no abuse of discretion under section 115-7.4 where six years had elapsed). Here, the 2007 incidents were sufficiently close in time to be relevant and probative. Second, the factual similarities between the 2007 incidents and Schaefer's death support the admission of the other-crimes evidence. All incidents involved the same victim, the same location (defendant's home), and alleged violence. As to defendant's point that there was no evidence that alcohol played a role in Schaefer's death or that he used a gun in the prior incidents, we note that the "existence of some differences" between a charged offense and other-crimes evidence does not defeat the admissibility of the other-crimes evidence, because no two crimes are identical. *Donoho*, 204 Ill. 2d at 185. What is critical here is that all incidents resulted in physical injury to Schaefer, evidently inflicted by defendant in defendant's home. "To be admissible under section 115-7.4, the other-crimes evidence must bear merely 'general similarity' to the charged offense." *People v. Heller*, 2017 IL App (4th) 140658, ¶ 44 (quoting *People v. Jackson*, 2014 IL App (1st) 123258, ¶ 43). Further, it "is well established" that "prior assaults against a victim of a crime that a defendant is charged with committing is probative of intent or motive." *People v. Abraham*, 324 Ill. App. 3d 26, 35 (2001) ("in any murder case prior attacks against the murder victim are necessarily nonfatal yet have been held probative of intent"); see also *People v. McCarthy*, 132 Ill. 2d 331, 337 (1989) (in murder case, State permitted to introduce evidence that the defendant had previously struck the victim several times and broken the windows of the victim's family member's car, as evidence showed the defendant's intent to harm). Thus, we do not find persuasive defendant's claim that, because Schaefer continued to live with him for several years after the 2007 incidents, Schaefer did not interpret them as suggesting that defendant would harm her in the future. As to defendant's argument concerning alcohol, *i.e.*, that there is no evidence that it was a factor in this case and

that thus there is insufficient similarity between the 2007 incidents and Schaefer's death, this assertion has been rejected on the basis that a general similarity between prior acts and the charged offense is sufficient and that intoxication during earlier assaults show hostility toward victim and, thus, is probative of intent and motive. *Abraham*, 324 Ill. App. 3d at 35. Third, the trial court did not err in determining that the probative value of the other-crimes evidence outweighed its prejudicial effect. The 2007 incidents did not become the focus of defendant's trial. See *People v. Boyd*, 366 Ill. App. 3d 84, 94 (2006) (other-crimes evidence must not become a focal point of the trial, and the detail and repetition admitted must be narrow so as to avoid the danger of a trial within a trial). Further, as noted, the fact that the 2007 incidents were reasonably close in time to Schaefer's death, along with their factual similarities, render them relevant and probative. The trial court instructed the jury that it could consider the other-crimes evidence only on the issues of intent and motive. There is a strong presumption that jurors follow the court's instructions (*People v. Taylor*, 166 Ill. 2d 414, 438 (1995)), and we find no indication in the record that rebuts this presumption. The jury instruction reduced the possibility of any undue prejudice to defendant from the admission of the evidence.

¶ 174 Defendant's assertion that there was no evidence that he had inflicted Schaefer's 2007 injuries is not well taken. He pleaded guilty to battery for the September 2007 incident. Although this was a lesser crime than the domestic battery with which he was initially charged, it does not reflect that, as defendant suggests, his guilt was not as clear-cut as the jury was led to believe. The offense of battery is defined as "knowingly without legal justification by any means (1) caus[ing] bodily harm to an individual or (2) mak[ing] physical contact of an insulting or provoking nature with an individual." 720 ILCS 5/12-3(a) (West 2016). The supreme court has noted that bodily harm for purposes of battery constitutes "some sort of physical pain or damage

to the body, like lacerations, bruises or abrasions, whether temporary or permanent." *People v. Mays*, 91 Ill. 2d 251, 256 (1982). To suggest that the prior incidents, especially the September 2007 incident, do not suggest defendant's hostility toward Schaefer or indicate his motive and intent to murder her strains credulity. Nor do we find error with the trial court's admission of evidence of the August 2007 incident, where the domestic battery charge was ultimately nol-prossed. The evidence concerning that incident was that, when Deputy Satkiewicz arrived, she observed that Schaefer was bleeding and complaining of a hurt wrist (that was later determined to be broken). No one other than defendant was present at the residence. A reasonable inference was that defendant inflicted Schaefer's injuries, and this inference was strengthened by the September 2007 incident (only one month later, of a similar nature, and for which defendant pleaded guilty to battery). Finally, we disagree with defendant's argument that, because the evidence overall was close, the unfair prejudice was magnified and far more likely to change the outcome of the trial. We address in full below the sufficiency of the evidence and conclude that it was overwhelming.

¶ 175 Finally, defendant addresses section 115-20(a) of the Code, arguing that it permits the admission of evidence of a prior conviction of domestic battery but not battery. He notes that, although he was charged with domestic battery in 2007, he was ultimately convicted only of battery. Thus, he argues, his battery conviction was not admissible under section 115-20. The State responds that *Chapman*, 2012 IL 111896, supports its argument that the battery conviction was properly admitted, notwithstanding that battery is not explicitly listed in the statute. In *Chapman*, the supreme court held that section 115-20 is not restricted to prosecutions involving the crimes explicitly listed in the provision. *Id.* ¶ 26. The court noted that the statute's provision that the enumerated prior convictions (which, again, do not include battery) are " 'admissible in a

later criminal prosecution for *any of these types of offenses* when the victim is the same person who was the victim of the previous offense that resulted in conviction of the defendant' " means that the prior convictions can be admitted in a prosecution for any offense of their kind. (Emphasis in original.) *Id.* ¶¶ 24-25 (quoting 725 ILCS 5/115-20(a) (West 2006)). We agree with defendant that *Chapman* does not address the issue before us. Here, the issue is whether a nonenumerated conviction (battery) can be admitted in a later prosecution for a similar kind of offense (murder). *Chapman* involved an earlier conviction of an enumerated offense (domestic battery) and a later prosecution for murder, which the court held was one of the "types of offenses" to which section 115-20 refers. *Id.* ¶ 28. However, we need not resolve the issue, because the other-crimes evidence was admissible under the common law and section 115-7.4.

¶ 176    In summary, we cannot conclude that the trial court abused its discretion in admitting the other-crimes evidence.

¶ 177                    C. Admission of Evidence of Defendant's Ownership of Firearms

¶ 178    Next, defendant argues that the trial court erred in admitting evidence—specifically, statements that he made at his interrogation—that he owned firearms not proven to be connected with Schaefer's death. He contends that the evidence lacked probative value and was overwhelmingly prejudicial.

¶ 179    At the trial court's discretion, relevant evidence may be excluded if its prejudicial effect substantially outweighs its probative value. Ill. R. Evid. 403 (eff. Jan. 1, 2011); *People v. Eyler*, 133 Ill. 2d 173, 218 (1989). We will not disturb the trial court's determination, absent an abuse of discretion. *People v. Shum*, 117 Ill. 2d 317, 353 (1988). As noted, a trial court abuses its discretion if its determination is unreasonable. *Donoho*, 204 Ill. 2d at 182.

¶ 180   Defendant argues that he did not possess any firearms at the time of his arrest in Las Vegas, no weapons were found in his home, and no bullets were recovered that were matched to any gun that could have caused Schaefer's death.  However, the State was permitted to present evidence that defendant owned as many as five guns, including a .22-caliber handgun and a .45-caliber handgun.  The State, he notes, did not argue that any of the guns were used in the crime, and the jury was not presented with evidence that defendant used a specific type of gun in the killing.  Defendant asserts that every reference to the guns should have been redacted from his statements.

¶ 181   Defendant further contends that the closest the State got in its attempt to present actual evidence rather than speculation was its reference to the yellow piece of paper that referred to a .45-caliber gun along with two boxes of .45-caliber cartridges and five boxes of shotgun shells.  Defendant notes that the paper was not dated, no such gun was located, and no .45-caliber cartridges or shotgun shells were found.  Also, neither Dr. Blum's nor Bitton's testimony established that a .45-caliber weapon was used in the murder.  Defendant argues that the State was not able to establish when he owned or possessed firearms and accessories.  The firearms evidence, defendant argues, was overwhelmingly unfairly prejudicial because it suggested that he was a violent person capable of using a firearm in an act of violence.  He also asserts that jurors often possess strong feelings about firearms and might have found him guilty simply because he might have possessed a firearm at some point in the past.

¶ 182   Defendant relies on several cases that held that the admission of actual firearms was erroneous.  See *People v. Smith*, 413 Ill. 218, 223 (1952) (admission of shotguns that had no connection to the offense was erroneous); *People v. Maldonado*, 240 Ill. App. 3d 470, 478-79 (1992) (also noting that, generally, a weapon is not admissible unless there is evidence

connecting it to the defendant and the crime, or unless the defendant possessed it when arrested for the crime); *People v. Jackson*, 154 Ill. App. 3d 241, 246 (1987) (admission of gun unrelated to offense was erroneous). However, those cases are arguably distinguishable because the weapons themselves were admitted into evidence. Here, in contrast, no weapon was admitted.

¶ 183 The State asserts that the trial court did not abuse its discretion in admitting defendant's statements about gun ownership. The evidence, in its view, was relevant. During his interrogation, defendant admitted that he owned a rifle and inherited his father's .22-caliber and .45-caliber guns. He also stated that he had owned five guns that had been stolen from him and that he owned at least two .45-caliber guns and a black rifle. A note on the yellow sheet of paper in his handwriting, describing one of the .45-caliber weapons and including its serial number, corroborated these statements. One of these weapons, the State urges, could have caused Schaefer's injuries. Dr. Blum testified that Schaefer was killed by gunshot wounds to the head and spine.

¶ 184 The State relies on *People v. Hoffstetter*, 203 Ill. App. 3d 755, 773 (1990), a murder case wherein the reviewing court upheld the trial court's admission of testimony concerning a handgun that belonged to the defendant's roommate. The roommate testified that the gun was missing for several days while another man was staying with the roommate and the defendant and that the gun reappeared after the roommate mentioned its disappearance to the defendant. At a later time, the gun again disappeared, permanently. The *Hoffstetter* court held that the roommate's testimony was admissible as circumstantial evidence, even though the murder weapon or weapons—the victims were killed by .22-caliber gunshots—were never located. *Id.* The court noted that 13 types of weapons could have fired the shots and that both the defendant and the other man had access to such a weapon around the time of the murders. *Id.* Further,

although there was no evidence that the roommate's gun was taken by either the defendant or the other man or that it was used by either of them to commit the murders, "the weight to be given to [the roommate's] testimony was a determination for the jury." *Id.*

¶ 185    Here, as the State views it, the evidence was even more relevant because defendant's statements admitting to gun ownership established the material fact that defendant had possessed guns and was familiar with them.

¶ 186    We believe that this case is more like *Hoffstetter* than the cases upon which defendant relies, but it is distinguishable from *Hoffstetter* in critical respects.  In that case, the caliber of the gun used to kill the victims was identified.  That was not the case here.  Dr. Blum could not identify the caliber of the gun that killed Schaefer, and thus he could not rule out any types of guns.  Further, in *Hoffstetter*, the defendant and the other man had access to a type of weapon that could have killed the victims.  That was not proven here.  No weapons were found on defendant when he was arrested or in his residence after Schaefer's body was discovered.

¶ 187    Other jurisdictions, in cases with fact patterns closer to this case than to *Hoffstetter*, have found error with the admission of the firearms evidence.  See, *e.g.*, *Smith v. State*, 98 A.3d 444, 453-54 (Md. Ct. Spec. App. 2014) (pivotal issue was whether the defendant shot the decedent or whether the decedent killed himself; after reversing convictions because of a *voir dire* error, court addressed issue likely to occur on remand and determined that the trial court erred in admitting evidence that the defendant owned eight firearms and ammunition that were not related to the shooting; evidence was minimally relevant and highly prejudicial; the fact that the defendant legally possessed guns and ammunition did not make the weapons relevant to the victim's death or help prove the charged offense); *Commonwealth v. Valentin*, 50 N.E.3d 172, 179 (Mass. 2016) (admission of evidence of the defendant's lawful ownership of weapons and

ammunition, other than weapon used in the shootings (which was admitted into evidence), was erroneous because it was not relevant and, even if relevant, it was highly prejudicial because "it portrayed him as someone *** likely to commit murder"; further holding, however, that the evidence against the defendant was strong and that the verdict would not have been different if the improperly admitted evidence had been excluded); *State v. Rupe*, 683 P.2d 571, 594-97 (Wash. 1984) (admission, during sentencing, of evidence of the defendant's gun collection, which was not used in the commission of the charged crimes, was erroneous because it was irrelevant, prejudicial, and violative of due process; it was irrelevant because there was "no relation between the fact that someone collects guns and the issue of whether they deserve the death sentence"; it was highly prejudicial because "[p]ersonal reactions to the ownership of guns vary greatly" and the sole purpose of the evidence was to portray the defendant as an extremely dangerous person; ordering new sentencing hearing).

¶ 188 We agree with defendant that the trial court abused its discretion in admitting his statements about his ownership of firearms. We find persuasive the foreign case law and agree that the evidence here was irrelevant and highly prejudicial. At best, the evidence showed that defendant owned guns at some point. However, none were found at the scene and no particular gun was identified as the type that inflicted Schaefer's wounds. Admission of the evidence allowed the jury to speculate and unreasonably infer that, because defendant owned guns at some point, he was more likely to be the killer. It also could have played into certain jurors' negative opinions concerning gun ownership.

¶ 189 However, we conclude that the error was harmless. To establish that an error was harmless, the State must prove beyond a reasonable doubt that the verdict would have been the same absent the error. *People v. Montano*, 2017 IL App (2d) 140326, ¶ 124. When deciding

whether an error was harmless, a reviewing court may (1) focus on the error to determine whether it might have contributed to the conviction, (2) examine the properly admitted evidence to determine whether it overwhelmingly supports the conviction, or (3) determine whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence. *Id.* Here, as we discuss below, the evidence of defendant's guilt, without the firearms evidence, was overwhelming. Accordingly, we reject defendant's claim.

¶ 190                             D. Sufficiency of the Evidence

¶ 191   Finally, defendant argues that the evidence was insufficient to sustain his convictions. For the following reasons, we disagree.

¶ 192   A reviewing court will not set aside a criminal conviction unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). When we review a challenge to the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis omitted.) *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The trier of fact is responsible for resolving conflicts in the testimony, weighing the evidence, and determining what inferences to draw, and a reviewing court ordinarily will not substitute its judgment on these matters for that of the trier of fact. *People v. Cooper*, 194 Ill. 2d 419, 431 (2000).

¶ 193   A person commits first-degree murder if, in performing the acts that cause a death, without lawful justification, he or she knows that the acts create a strong probability of death or great bodily harm to the victim or another. 720 ILCS 5/9-1(a)(2) (West 2012).

¶ 194 We conclude that the evidence, even excluding the firearms evidence, was sufficient to sustain defendant's conviction and, further, that it was overwhelming. It is undisputed that Schaefer lived with defendant and that, several years before her death, defendant pleaded guilty to battery of Schaefer. Haskell testified that Schaefer was killed between October 2011 and June 2012. Bitton and Pribek testified that they last saw Schaefer around January 2011. Jones testified that there was "a lengthy period" during which defendant still occupied the house and Schaefer was no longer present. Defendant left on his cross-country trip on June 15, 2012.

¶ 195 Defendant's testimony that Schaefer might have moved to Missouri was belied by the evidence of items that belonged to Schaefer found in her bedroom. The evidence included her checkbook (with the last recorded entry dated September 28, 2011), day planner (with the last entry dated September 29, 2011), credit cards, purse, mail, and identification. Defendant had no plausible explanation for why Schaefer would have left behind necessary personal items. Defendant merely (and wildly) speculated that Schaefer had enemies and might have been a drug dealer.

¶ 196 Defendant's actions before he left on his trip were highly unusual, and his actions afterward were highly suspicious. Before he left (and after Schaefer had not been seen for months), defendant secured his residence by screwing shut the windows and doors. Defendant denied sealing Schaefer's bedroom and could offer no explanation for the presence of his DNA on a piece of latex glove found on duct tape on the doorframe, other than speculation that it was his enemies' attempt to frame him for murder. He testified that he took the security measures to protect his belongings and because he did not trust Bitton, whom he had actually hired as the property's caretaker. He also spoke to her almost daily after he left and repeatedly instructed her not to enter the residence. However, defendant's actions after his residence sustained water

damage completely undermined his claim that he took the highly unusual measures to protect his home. When pipes burst and water was running down the walls, defendant continued to instruct Bitton not to enter the residence. The only reasonable inference from this evidence is that defendant was not concerned about his valuables or damage to his property but was hiding something in the home. Indeed, on November 6, 2013, Schaefer's skeletal remains were found in her bedroom.

¶ 197 Defendant argues that the State failed to attach a date to Schaefer's death, specifically a date before defendant left Illinois. He contends that Haskell first opined that she died between the warm weather in 2011 and the warm weather in 2012 and later opined that she died between October 2011 and June 2012. This lack of precision, defendant asserts, precluded any reasonable fact finder from placing any weight on Haskell's testimony. We disagree. Haskell specified that the period to which he referred was the warmer months between October 2011 and June 2012. Defendant also attacks Haskell's testimony by noting that Haskell did not collect the insects himself and did not use precise weather data (where he used McHenry data instead of data specific to 518 North Country Club Drive). We reject defendant's argument. First, he does not point to any evidence of tampering with the physical evidence, nor does he suggest that the weather in the vicinity of his residence was substantially different from that in McHenry as a whole. Second, these aspects of Haskell's testimony do not undermine his estimates of when Schaefer died.

¶ 198 Further, we are not persuaded by defendant's argument that neither Schaefer's day planner nor Haskell's testimony "even suggested" that Schaefer died while defendant was in Illinois. The evidence showed that no one saw Schaefer for a while before defendant left on his trip and that defendant exercised unusually restrictive control over his home, where Schaefer's

remains were located. This, along with the other evidence noted above, was more than sufficient to tie him to the murder.

¶ 199   Next, addressing the physical evidence, defendant argues that the DNA on the piece of latex glove on the duct tape on the doorframe of Schaefer's bedroom did not suggest that defendant caused her death. He claims that he resided in the home and that common sense dictates that his DNA would be present on many items. Similarly, he criticizes the State's arguments concerning the evidence about his home-improvement purchases, arguing that common sense dictates that it is normal for a homeowner to purchase such items. We do not dispute that this evidence, in isolation, does not overwhelmingly point to defendant as the killer. But the jury was presented with much more, indeed overwhelming, evidence, as related above, that linked defendant to Schaefer's death.

¶ 200   Finally, defendant notes that Bitton claimed to have observed the sealed door many times but that Oliver testified that he did not see the sealed door when he entered the home in 2013. Defendant contends that there was no reasonable basis for the jury to accept Bitton's testimony over Oliver's testimony. We disagree. The fact that Oliver did not notice the sealed door does not imply that it was not actually sealed. Also, he did not testify that he looked at Schaefer's bedroom door. His concern was the water damage.

¶ 201   In summary, even without the firearms evidence, the evidence of defendant's guilt was overwhelming.

¶ 202                           III. CONCLUSION

¶ 203   For the reasons stated, the judgment of the circuit court of McHenry County is affirmed. As part of our judgment, we grant the State's request that defendant be assessed $50 as costs for

this appeal.  55 ILCS 5/4-2002(a) (West 2016); see also *People v. Nicholls*, 71 Ill. 2d 166, 178 (1978).

¶ 204   Affirmed.